## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SHANA SWENSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 2:19-cv-00210-GZS |
| | ) | |
| FALMOUTH PUBLIC SCHOOLS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Falmouth Public School's Motion for Summary Judgment (ECF No. 32). Having reviewed the record as well as the parties' legal memoranda, the Court GRANTS the Motion for the reasons explained below.

### I.    LEGAL STANDARD

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute is 'one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party.'" Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). "A fact is 'material' if 'its existence or nonexistence has the potential to change the outcome of the suit.'" Tropigas de Puerto Rico, Inc. v. Certain Underwriters of Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). The party moving for summary

judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Inds., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quotation marks and internal ellipsis omitted); see also FED. R. CIV. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Human Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (quotation marks omitted).

## II.    FACTUAL BACKGROUND

Defendant Falmouth Public Schools ("Falmouth") operates three schools in the community of Falmouth, Maine:  Falmouth Elementary School ("FES"), Falmouth Middle School, and Falmouth High School.  Plaintiff Shana Swenson ("Swenson"), who has both a bachelor's and master's degree in education and is a Nationally Board Certified Teacher in special education, was

hired as the Response to Intervention ("RTI") teacher for grades three through five at FES in August 2015. Before starting at FES, she worked for six years as a full-time special-education teacher in Maryland, where she worked collaboratively with her school's RTI team. When Swenson was interviewed and hired by FES in 2015, John Flaherty was in his last year as principal at FES, and Ryan Gleason served as assistant principal. Flaherty was involved in and favored hiring Swenson, impressed by her resume and responses to interview questions and believing she would be a good fit at FES. Both Flaherty and Gleason believed her to be qualified.

RTI is a three-tiered approach to identifying and supporting students with learning and behavioral needs; students in RTI receive individualized instruction, screening, and intervention in accordance with their identified tier to ensure they make adequate progress in school. Differentiated instruction, i.e. instruction based on each student's needs and not necessarily following the same program for each, is the hallmark of RTI. As the RTI teacher, Swenson used "all different strategies" to support student reading improvement, including fluency and comprehension support. (ECF No. 28-1, PageID # 240.) She also used many reading programs to provide instruction, including "Wilson," "Great Leaps," "Read Naturally," "Lexia," and "LLI." Student needs determined the mix of programs and strategies she would draw upon when executing a lesson.

At FES, RTI instruction for grades three through five is provided by a team consisting of a classroom teacher and education technicians ("ed techs"), and it is overseen by a Learning Strategist. Students are assessed at the beginning of the year, and each student identified as needing RTI is assigned to one member of the RTI team for support, beginning in late fall and continuing through the year. Because Tier III students are those with the most profound needs, the RTI teacher ideally provides them with direct instruction, while the ed techs instruct students

with less severe needs.  While Swenson served as RTI teacher, however, Tier II and III students were consistently assigned to one of the team's ed techs.[1]

Falmouth's regular practice is to have school administrators perform a total of five classroom observations (two formal observations and three mini-observations) and prepare a summative evaluation at the end of the year for all probationary employees, i.e., those in their first two to three years of employment.  The observations are intended to be snapshots of a teacher's performance at the time the observation occurs.  The summative evaluation is intended to be a 360 degree evaluation of the teacher's performance throughout the year.  Administrators have authority to issue discipline to teachers, including a verbal discussion, written discipline, an improvement plan, and paid or unpaid leave.

During Swenson's first probationary year at FES, the 2015-2016 school year, Gleason conducted two mini-observations and one formal observation of her instruction.  Both Gleason and Flaherty believed Swenson qualified, found that she performed her job well, and had no concerns about her performance.  Flaherty observed that her leadership and communication skills were "great" and that she "did beautifully scheduling kids."  (ECF No. 28-16, PageID # 549.)  Swenson also developed good relationships with her RTI colleagues and got along well with them during her first full school year.  None of her colleagues conveyed any concerns to her or others about her performance.  Her contract was renewed at the end of the school year.

Swenson learned that she was pregnant during Spring 2016.  When she told her supervisors and coworkers, they all appeared excited for her, though one ed tech told her that if she decided not to come back after maternity leave, nobody would hold the decision against her.  (ECF No. 28-1, PageID # 245.)  The following summer, Swenson explored options for maternity leave.  After

---

[1] Swenson collaborated with an ed tech to make student assignments, which were driven by student needs and scheduling concerns.

reviewing the calendar with personnel from Falmouth's Human Resources Department, she calculated that the twelve weeks of Family and Medical Leave Act ("FMLA") leave to which she was entitled would extend through mid-April, and she decided to request additional leave through the end of the year.  Gloria Noyes became the principal of FES in June 2016, when she took over for Flaherty upon his retirement.  Swenson thus made her request for extended leave to now-principal Noyes, who was supportive and expressed no reservations.

Swenson began her second probationary year teaching at FES in August 2016 and worked until going on leave in the middle of January 2017.  During this time, she maintained a professional relationship and got along well with her RTI colleagues.  They did not alert her to any work-related problems or concerns with her performance.  Before Swenson's leave, Noyes and Gleason each performed one formal evaluation of her performance.  Both gave her positive assessments, and when she went on leave, Noyes appeared supportive.

Although there was initially some uncertainty as to who would cover for Swenson while she was on leave, Laurie Winslow eventually assumed her duties.  Winslow is a certified teacher who had worked in Swenson's RTI team as an ed tech.  In May 2017, during Noyes's end-of-year evaluation for Winslow, Winslow reported concerns about Swenson's instructional ability.  She said she felt that Swenson was using the Wilson reading method for several students who did not need that level of instruction and would not benefit from that approach.[2]  Winslow also had concerns that Swenson overused technology and undersupported her ed techs.  While Swenson was on leave, Noyes also received information that Swenson had seven of her eleven students on the identical Wilson lesson before she left (ECF No. 28-14, PageID # 481) and that Swenson had

---

[2] The Wilson program is a reading intervention system that can be used in intensive fashion to support struggling readers.  (See ECF No. 28-1, PageID # 240.)

5

been providing Wilson instruction to a student in the 95th percentile for reading.[3]  Finally, Noyes

spoke to Learning Strategist Joy Halligan in early June 2017, and Halligan reported concerns about

Swenson's substantive knowledge of decoding and the effectiveness of her interactions with team

members.[4]

Taking into account information from that year's observations as well as feedback from

Swenson's colleagues and Swenson's self assessment,[5] Noyes completed Swenson's summative

evaluation in June 2017.  She rated Swenson as either "highly effective" or "effective" in all

categories.  She also noted Swenson's prowess with the Wilson program and noted as areas for

growth:  (1) building community and rapport with her ed tech team and (2) improving her

foundational knowledge of reading instruction to provide a differentiated approach to that subject's

instruction.  (See ECF No. 28-12, PageID #s 417-32.)  The summative noted:

> With Shana's maternity leave being from mid-December 2016 until
> the return of this school year August 2017, it has made composing a
> thorough summative more challenging, as we were not able to
> gather all of the evidence that would normally be gathered over the
> course of a full year.  It would have been advisable to keep her on
> the second year of probation rather than putting her forward for a
> third year of probation.

(Id., PageID # 431.)  Because of scheduling issues, Noyes and Swenson agreed to meet about her

summative evaluation when Swenson returned to school in the fall, rather than in June.

---

[3] According to Noyes, Wilson instruction would generally be an inappropriately intensive program for a reader at that
high a level.  (ECF No. 28-14, PageID # 507.)

[4] Swenson denies that Winslow's or Halligan's concerns or the information Noyes received accurately reflect her
teaching.  (See ECF No. 35, PageID #s 710-12.)  But Winslow's and Halligan's concerns about Swenson's
performance and the information Noyes received regarding Swenson's use of the Wilson program are not admitted
for the truth of the matter asserted; i.e., they have no probative value as to the actual substance of Swenson's teaching
before she went on leave.  Rather, they represent hearsay evidence demonstrating effect on the listener, Noyes.
See FED. R. EVID. 801-02.

[5] Swenson rated herself as exceeding expectations in 55 out of 58 categories.

In August 2017, shortly before Swenson's return, she sent Noyes an email regarding her schedule for the first day of school.  Her newborn would be staying at the Falmouth Schools childcare center during the workday, and Swenson intended to take breaks during the day to nurse.[6] Noyes responded supportively and asked Swenson about her preferences for expressing breast milk, so she could set up an appropriate space.  Swenson provided a rough schedule of her pumping and nursing times for her first days back.  (ECF No. 28-3, PageID #s 289-91.)  At this time, Swenson found Noyes supportive of her nursing and pumping.  The two met on September 8, 2017, to discuss Swenson's summative evaluation from June.[7]  In that meeting, the two discussed Swenson's comfort level with different reading intervention programs, and Swenson explained to Noyes that, since she had missed training in LLI, implementing it in her lessons remained an area of growth.  (ECF No. 28-1, PageID # 265.)  In her summative conversation notes, Noyes referenced Swenson's "honesty about not feeling comfortable with other reading interventions" besides Wilson.  (Id.)

Upon her return, Swenson provided her team and administration with daily schedules of her anticipated breaks to express breast milk.  These were not met with any objection or resistance at first.  (ECF No. 28-1, PageID # 252.)  However, within a few weeks of Swenson's return, her colleagues made negative comments to her about her not supporting them while on leave and having her responsibilities fall on them during that time.  Her colleagues also treated her differently after she returned and requested to take nursing breaks.  Swenson deemed this treatment rude, disrespectful, and harassing.

---

[6] FES contains a daycare for children of employees of the Falmouth School Department, and, during Noyes's tenure as principal at FES, she has always permitted staff with children at the daycare to spend time with their children as their schedules allow.

[7] Swenson submitted a rebuttal to the summative at the end of September.

One day in September, before students arrived, Swenson told Michele Sanzari, an ed tech, that Swenson's son was having trouble napping and taking a bottle, so she needed to go nurse him; Sanzari asked whether Swenson would be able to service students with her current schedule. Visibly upset, Swenson replied that she would need to continue taking nursing breaks in accordance with her and her son's needs. Sanzari again asked how Swenson was going to make her schedule work once the team was working with students. Sanzari also stated that she supported Swenson's nursing and pumping. Still upset, Swenson moved to another room to be alone.

Sanzari and Sallie Gardner, another ed tech, harbored concerns that Swenson's schedule would impact the team's ability to service students. They took issue, for example, with the fact that Swenson's schedule included a break to express breast milk around 9 A.M., when the team began servicing students. Sanzari and Gardner wondered why Swenson did not shift her nursing time forward to be completed before students arrived. For her part, Swenson regarded her schedule as flexible and would adjust it with the flow of the day. For example, if she took her first break at 9:30, her next would be "either 11:30 or 12:30, depending on what made the most sense as [the class] went throughout the day." (ECF No. 28-1, PageID # 250.) Taking breaks at the "two- to three-hour mark was [Swenson's] guiding factor" in her schedule. (Id.) There is no evidence she ever made it a standard practice to complete her morning break before students' arrival. But she did change her schedule in late September 2017 to ensure that assessments she and the RTI team needed to complete were finished in an appropriate and timely manner.

Sanzari continued to make comments about Swenson's nursing practices after the September incident.[8] Swenson asked Sanzari to stop commenting on her nursing needs. Swenson

---

[8] While the Court is required to construe the facts in the light most favorable to Swenson, the Court notes that there is a genuine dispute on this point. (See ECF No. 35 (Pl.'s Resp. to DASMF), PageID # 739; ECF No. 37 (Def.'s R. to PASMF), PageID # 943.)

also told her colleagues she planned to continue breastfeeding, would appreciate their support, and had a legal right to take nursing breaks.  In response, Winslow at least once stated something along the lines of, "When you bring up the law, it turns me off."  (ECF No. 28-1, PageID # 248; ECF No. 35, PageID # 740; ECF No. 37, PageID # 944.)

Swenson first reported the comments and her belief that such treatment was not supportive to Michelle Gagne, the Learning Strategist who replaced Halligan in Swenson's third probationary year.  On or about September 19, 2017, Swenson encountered Noyes, with whom she also raised her concerns.  Noyes informed her that her schedules were being viewed as inflexible and suggested she talk with her colleagues to create a better rapport.  Swenson acted on the suggestion, addressing her colleagues' concerns at a team meeting.  During that meeting, Swenson said she understood that her colleagues were feeling frustrated about her availability due to her nursing needs but explained that she had a legal right to take nursing and pumping breaks.  She asked her colleagues to stop making the comments that she found offensive and requested their support.  Following that meeting, Gardner told her, "I'm disappointed that you brought up the law," and "I'm disappointed that you are not putting the students first."  (ECF No. 28-1, PageID # 258.)  On September 28, 2017, Swenson emailed Noyes, alleging that her colleagues were harassing her and stating that she did not feel supported by them.  Noyes replied that she would support Swenson's nursing needs.  Noyes met with Swenson's team soon thereafter and instructed them to be supportive of her schedule.  From conversations with Sanzari and Gardner, Noyes knew they were struggling to schedule a Tier III student only available during Swenson's breaks; Noyes instructed the ed techs to support the Tier III student themselves for now.  She affirmed that Swenson would continue to take breaks to nurse and pump as she felt was needed and told the team to support her.  She instructed the team to address any further concerns to her, not Swenson.

According to Swenson, Sanzari again stated, "I just don't know how you're going to make this work once we start with the kids," sometime in October. But Noyes did not hear about issues between Swenson and her team regarding Swenson's pumping and nursing schedule until October 20, 2017. On that day, Swenson reported to Noyes that Gardner had told her, "There are other ways to nourish your child that wouldn't impact our team," or words to that effect. Based on Swenson's report, Noyes felt that Gardner's conduct was inappropriate and might rise to the level of bullying. She notified the school superintendent about Swenson's allegations and began an investigation. She first interviewed Swenson, who encouraged her to speak with three other employees to give perspective on the team's culture. Noyes then interviewed Gardner, who admitted to making the comment and stated that it was meant to be supportive, not judgmental. Noyes found this credible but told Gardner that the comment had been inappropriate and, if she engaged in similar future conduct, she would be subject to discipline. Noyes next spoke to the three employees Swenson had named as well as Sanzari, whom she informed of Swenson's complaint that Sanzari harassed her on a daily basis. All expressed concern about Swenson's rigidity with scheduling. The three named by Swenson also noted issues with her demeanor toward colleagues. Since these comments echoed areas for growth noted in Swenson's most recent summative performance evaluation, Noyes decided to meet with Swenson to formalize them as concerns. She drafted an action plan and scheduled a meeting on November 3, 2017, that included Swenson and a union representative. During the meeting, Swenson firmly disputed the suggestion that she was relying on the same programming for all her students.

Noyes met with Swenson and her union representatives again on December 19, 2017. At that meeting, a union representative said it would have been helpful if prior administration had provided Swenson with more feedback, and the group agreed that she had received more feedback

since Noyes's arrival.  Swenson and her union representatives requested changes to the action plan Noyes had drafted and asked that it be renamed a "Growth Plan."  Noyes agreed to these requests. The informal Growth Plan, which, Swenson was told, would not be part of her file, was finalized on January 9, 2018, though not without objection from Swenson.

After the Growth Plan's implementation, it appeared to Noyes that Swenson's relationship with her colleagues improved.  Noyes perceived an issue in Swenson's performance in January, when she violated instructions from the Learning Strategist regarding communication with staff about a possible change in student progress monitoring.  Noyes also learned from the District's Director of Learning that Teacher Leaders for grades three through five had expressed concerns about Swenson's communication style.[9]  Noyes followed up with the Teacher Leaders, who confirmed the concerns conveyed by the Director of Learning and added that they did not feel Swenson was providing them with adequate support because of her programmatic approach.  In late January, Noyes eventually had to speak to Swenson about her critical and unprofessional demeanor toward fifth-grade teachers at a fifth-grade team meeting and a subsequent meeting with her own team.  Nevertheless, she believed Swenson's performance improved in February and March, resulting in a better classroom environment.  (ECF No. 28-14, PageID # 499.)  Swenson also received a positive mini-observation evaluation from FES's assistant principal on January 25. For her part, Swenson perceived Noyes as treating her less kindly and warmly and as being shorter with her after her harassment complaints.

On March 29, 2018, the kindergarten literacy RTI teacher communicated concerns about Swenson's need for additional support and training in a literacy intervention system to Noyes.  She

---

[9] Swenson objects that this statement of fact constitutes "hearsay within hearsay."  However, as the hearsay is included, not for the truth of the matter asserted, but for its effect on the listener (i.e., as background for Noyes's actions), it is admissible in that respect.  See FED. R. EVID. 801-02.

told Noyes that Swenson had been trained on the system in October 2016 and should have been using it and gaining familiarity with it since then.  On April 2, 2018, Noyes met with Swenson for a pre-observation conference.  In the meeting, Swenson communicated that a group of students she would be instructing had recently moved up a reading level, but they were in the middle of a lesson they had started before improving to that level.  In discussing this issue with Swenson, Noyes became concerned about what she perceived as Swenson's uncertainty regarding the proper level of instruction for students.  Noyes conducted the formal observation on April 3 and rated Swenson's ability to differentiate instruction to the needs of her students as needing improvement. (ECF No. 33-9, PageID # 675.)

At around this time, FES's Learning Strategist discovered that there were a number of half-hour instructional slots that were left open in Swenson's schedule.[10]  The Learning Strategist also provided Noyes with notes from her coaching efforts with Swenson, which detailed continuing issues.[11]  (See ECF No. 28-7, PageID #s 310-12.)  Noyes met with Swenson on April 12, 2018, for a post-observation conference in which Noyes communicated her concerns about Swenson's performance and informed Swenson she would be issued a "needs improvement" in certain performance categories.

---

[10] According to Swenson, some of these open periods were undesignated ed-tech planning periods.  Given the fluctuating nature of the team's student caseload, she believed these periods had been left open to allow for flexibility in scheduling and were a consequence of scheduling difficulties that she had brought up with administration.  (ECF No. 28-1, PageID #s 269-70.)

[11] Swenson notes that coaching documentation was kept only as to her, although she had been under the impression that similar documentation was being created for each RTI teacher.  (ECF No. 28-1, PageID # 273.)  Noyes asked the Learning Strategist to provide special coaching to Swenson in accordance with her Growth Plan and to track their work in a document the Learning Strategist shared with Swenson.  (ECF No. 28-14, PageID # 498.)  Swenson denies that the Learning Strategist's report of performance issues accurately reflects her performance in the classroom.  As with other hearsay evidence included in this factual summary, the Strategist's report is included, not for the truth of the matter asserted, but for its effect on Noyes's decisions regarding Swenson.  See FED. R. EVID. 801-02.

Falmouth administrators are required to decide whether to recommend probationary employees for contract renewal by mid-May.  Because it can take a new teacher some time to get up to speed, administrators generally recommend renewing a teacher's contract at the end of each of the first two probationary years, even if the teacher has areas in which to improve.  However, since renewing a teacher's contract at the end of the final year of the probationary period puts that teacher on continuing contract status, a higher standard applies.[12]  When considering whether to renew the contract of a teacher in the third and final year of probation, Noyes considers whether the teacher under consideration is as good or better than anyone else who might be available. Reviewing and considering all of Swenson's prior evaluations and observations, Noyes chose not to recommend Swenson for a continuing contract.  The school superintendent accepted her recommendation.

On May 8, 2018, Swenson and her union representative met with the superintendent to discuss Noyes's termination decision.  Swenson told the superintendent that she was being discriminated against and had been terminated because of the issues surrounding her nursing breaks.  Swenson and the union representative also requested that the superintendent and Noyes consider transferring Swenson to another position.  The superintendent did not pursue this option with Noyes.

From September 2016 through June 2019, nineteen employees at FES took FMLA leave. During this period, twelve FES staff members, seven of whom were on probationary contracts, took maternity leave.  None of the employees who took FMLA leave during this period were disciplined at or near the time of their FMLA leave.  Among these employees, only Swenson was

---

[12] Once on a continuing contract, teachers in Maine public schools are entitled to automatic renewal of that contract absent a limited set of circumstances, and the contract must be for a period of no less than two years.  See 20-A M.R.S.A. § 13201.2.

not offered a contract in the years after taking leave.  Noyes recommended that the contracts for six of the seven probationary-contract employees who took maternity leave be renewed; Swenson's was the only one not so recommended.  All staff members who took maternity leave and returned to work while Noyes was principal at FES requested and were granted break time to nurse or pump breast milk.

In 2016, a full-time teacher at FES yelled at students and staff and insulted students by calling them "jerks."  She was issued a disciplinary letter but not an action plan and was not terminated.  The teacher's contract was renewed.  This teacher did not request nursing breaks and did not complain about discrimination or retaliation.  A full-time RTI ed tech was found drinking on the job and smelling of alcohol at FES.  Initially, she was spoken to about the issues but not terminated.  She did not take maternity or FMLA leave, request nursing breaks, or complain about discrimination.  In 2017 or 2018, another full-time teacher at FES gave students candy as an incentive, and a child contracted a severe allergic reaction about which the child's parents complained.  (ECF No. 28-11, PageID # 383.)  The teacher was told not to use candy as an incentive again but violated that order and received a letter of reprimand.  She also struck a child with a piece of cardboard and was issued a letter of reprimand and put on an improvement plan after the incident.  She had never disclosed a pregnancy, taken maternity or FMLA leave, requested nursing breaks, or complained of discrimination during her tenure.  She was not terminated after these instances of misconduct.

Noyes identified performance concerns in other probationary employees whose contracts nevertheless were renewed.  Noyes spoke with the superintendent regarding her concerns about a teacher in his first probationary year.  She also raised these concerns with the teacher in question, but never issued him a growth plan, improvement plan or any discipline for his performance

deficiencies and did not suggest his contract not be renewed.  This teacher did not request or take maternity or FMLA leave, request nursing breaks, or complain of discrimination.  Noyes also had performance concerns about a full-time probationary teacher in the RTI department and conveyed these concerns to the superintendent multiple times.  However, she did not issue the probationary RTI teacher any kind of improvement plan, rate her as "needs improvement" in any evaluation, or recommend non-renewal of her contract.  This probationary RTI teacher did not disclose a pregnancy, request or take FMLA or maternity leave, or complain of discrimination.

### III.    DISCUSSION

In her three-count First Amended Complaint (ECF No. 16), Plaintiff alleges that Defendant discriminated against her on the basis of pregnancy (Counts 1 & 2) and violated her rights under the FMLA (Count 3).  Defendant has moved for summary judgment on all counts.  The Court begins its analysis with the pregnancy discrimination claims, then turns to the FMLA allegations.

### A.  Pregnancy Discrimination (Counts 1 & 2)

Plaintiff alleges parallel disparate treatment and retaliation claims under the Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq.* ("MHRA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.*, and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). Like the parties, the Court treats PDA analysis as dispositive of the MHRA claim's merits.  See Green v. New Balance Athletic Shoe, Inc., 182 F. Supp. 2d 128, 135 (D. Me. 2002) ("The Court specifically discusses Plaintiff's claims pursuant to the PDA, but its conclusions are equally applicable to the Maine Pregnancy Act ('MPA'), 5 M.R.S.A. § 4572-A.").

The PDA amended Title VII of the Civil Rights Act of 1964 by specifying that discriminatory treatment "because of sex" includes actions taken "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).  Defendant argues

that, as a threshold matter, Plaintiff's discrimination claims must fail because breastfeeding and pumping are not protected under the PDA or MHRA. That is, lactation giving rise to breastfeeding or pumping is not a "related medical condition" within the meaning of the PDA. 42 U.S.C. § 2000e(k). Plaintiff counters that multiple circuits have ruled otherwise and her claim clearly alleges discriminatory treatment due to her status as a lactating worker. See Hicks v. City of Tuscaloosa, 870 F.3d 1253, 1259 (11th Cir. 2017); EEOC v. Houston Funding II, Ltd., 717 F.3d 425, 428 (5th Cir. 2013). The First Circuit has yet to address this legal question, and the federal courts that have are not in obvious unanimity. See, e.g., Notter v. N. Hand Protection, 89 F.3d 829 (Table) (4th Cir. 1996) ("Barrash stands for the narrow proposition that breastfeeding is not a medical condition related to pregnancy or to childbirth." (citing Barrash v. Bowen, 846 F.2d 927, 931 (4th Cir. 1988))). Given this open question, the Court assumes without deciding that lactation giving rise to breastfeeding or pumping is "a related medical condition" per the PDA as it analyzes Plaintiff's pregnancy discrimination claims. However, as explained in the following section, the Court ultimately finds that the record cannot support Plaintiff's discrimination claims even if the PDA encompasses discrimination due to an employee's lactation.

### 1. Disparate Treatment

A plaintiff suing for disparate treatment under the PDA and Title VII must show that her employer purposely took adverse action against her because of her pregnancy, childbirth, or related medical conditions. Green, 182 F. Supp. 2d at 135. Where, as here, the plaintiff attempts to meet this burden via circumstantial evidence, the familiar burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies. Id. Under this analysis, Plaintiff must first establish a prima facie case of pregnancy discrimination with evidence showing that (1) she was pregnant; (2) she was capable of adequately performing the job of RTI teacher; (3) her employer

16

took an adverse action against her; and (4) her employer filled her position with a comparably qualified person not within her protected class.  See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000).  Since Plaintiff has done so here, the burden shifts to Defendant to state a legitimate, nondiscriminatory reason for the adverse employment action.  Id. Falmouth asserts that it did not renew Plaintiff's contract because her performance did not meet the standard required of teachers hired at continuing contract status.  This reason given, the burden of proof shifts back to Plaintiff to show Defendant's stated reason is a pretext and its true reason for not renewing her contract is discriminatory.  Id.  Defendant urges that Plaintiff cannot generate a genuine dispute of material fact as to whether her pregnancy, childbirth, or status as a nursing mother was the true reason she lost her job.  The Court agrees.

The core issue in Plaintiff's disparate treatment claim is whether Defendant's justification for not renewing her contract "is not only a sham, but a sham . . . cover[ing] up" a discriminatory motive.  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991); see also Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 45 (1st Cir. 2002) (refining Mesnick by specifying that an employer is not automatically excused from Title VII liability by its own good-faith belief that its stated reason is nondiscriminatory).  Keeping in mind that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent," the Court must also recognize the context in which Noyes's adverse employment action took place:  that of a decision about whether to move Plaintiff to continuing contract status. Santiago-Ramos, 217 F.3d at 54.  Once on a continuing contract, teachers in Maine public schools are entitled to automatic renewal of that contract absent a limited set of circumstances, and the contract must be for a period of no less than two years.  See 20-A M.R.S.A. § 13201.2.  Thus, although not exactly a tenure decision, whether to promote a probationary teacher to continuing

contract status carries similar significance.  See Johnson v. Sch. Union, No. 107, 295 F. Supp. 2d 106, 112 (D. Me. 2003) (treating the continuing contract decision as one about whether the plaintiff was "a good enough teacher to deserve 'lifetime tenure'").  The First Circuit has stated that, in the context of a tenure denial case where the employer justifies its decision on the plaintiff's failure to meet standards, showing pretext requires "evidence . . . of such strength and quality as to permit a reasonable finding that the denial of tenure was 'obviously' or 'manifestly' unsupported." Brown v. Trs. of Boston Univ., 891 F.2d 337, 346 (1st Cir. 1989).  To succeed in establishing pretext, then, Plaintiff must provide evidence that Noyes's non-renewal decision was obviously or manifestly unsupported *and* covered up a discriminatory motive.

Simply put, Plaintiff has not presented such evidence here.  First, there is ample evidence that Defendant and Noyes have a practice of supporting pregnant and nursing employees and that they provided such support to Plaintiff.  Noyes proactively asked Plaintiff about her nursing and pumping needs before her return from maternity leave, supported Plaintiff's right to take breaks on her own schedule, and firmly and promptly responded when made aware that ed techs were saying things that Plaintiff found harassing.[13]  Moreover, Defendant's aggregate data regarding probationary employees who went out on maternity leave, returned, and nursed or pumped at work during Noyes's tenure at FES shows that all but Plaintiff had their contracts renewed.  Such a record makes it extremely difficult to discern discriminatory intent on the part of Defendant.

Further, the evidence documenting the timing of and sources from which Noyes either herself perceived or was alerted by others to deficiencies in Plaintiff's performance is sufficiently robust to undermine Plaintiff's claim of pretext.  Noyes first received information raising concerns

---

[13] Thus, in the Court's view, even if comments by the ed techs indicated a lack of tolerance for nursing mothers, no reasonable juror could conclude that Noyes, the relevant decisionmaker, shared such intolerance or that the views of the ed techs influenced Noyes's actions.

about Plaintiff's performance in June 2017 from both Joy Halligan, the Learning Strategist at that time, as well as an ed tech.  She noted these concerns as areas for growth in Plaintiff's 2017 summative evaluation and, during her conversation about that evaluation with Plaintiff, herself noted Plaintiff's limited comfort level with certain reading interventions.  During Noyes's investigation of Swenson's harassment allegations, both the ed techs Plaintiff recommended for interview as well as those Plaintiff accused of harassing her voiced concerns about her communication and scheduling styles.  In 2018, performance issues in line with those noted as areas for growth in Plaintiff's 2017 summative evaluation were noted by the new Learning Strategist, Michelle Gagne, as well as the Director of Learning for Teacher Leaders, the Teacher Leaders themselves, and the RTI literacy instructor for kindergarten.  Finally, Plaintiff's own scheduling documents and lesson plans added support to concerns that she was mismanaging the RTI schedule.  In sum, a variety of employees, not just the ed techs directly impacted by Plaintiff's maternity leave and lactation needs, noted and reported deficiencies in Plaintiff's performance, which Noyes confirmed with her own observations.  On this record, a rational factfinder could not conclude that Noyes's documented efforts to address Plaintiff's perceived performance deficiencies was a mere pretextual paper trail.

Indeed, no rational factfinder could conclude from this record that Noyes's decision was grounded in unlawful motive.  Although Plaintiff urges that her record of positive evaluations and lack of issues before her leave, contrasted with the performance record that emerged after, raises an inference of discriminatory intent, the fact that Plaintiff's positive record pre-leave largely came from a different leadership team and was based on limited observations of her performance during her first two probationary years diminishes the strength of such an inference.  See Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 20 (1st Cir. 1999) (noting that, where positive past

performance evaluations are based on work completed "in different capacities . . ., under different supervisors," they do not support a finding of pretext).  Turnover in FES's leadership coincided with Plaintiff's second probationary year, when she took leave; the standards by which she was being evaluated also shifted after that pivotal year, as Noyes's decision about whether to hire her on continuing contract status approached.  In this context, Noyes's comment about Plaintiff's maternity leave in her last summative evaluation before Plaintiff's final probationary year, when a heightened standard would apply, does not signal discriminatory intent.  Rather, it suggests Noyes's concern that Plaintiff's maternity leave had cut into her time and opportunity to develop as a probationary teacher before she would be considered for continuing-contract status at the end of her third year.  See Del Pilar Salgado v. Abbott Labs., 520 F. Supp. 2d 279, 292 (D.P.R. 2007) ("In determining whether causation exists, . . . courts should consider the actions taken against the employee within the overall context and sequence of events, the historical background of the decision, any departures from normal procedure, and contemporary statements by the employer's decision makers.").  Moreover, it is not entirely true that Plaintiff's performance evaluations were spotless until she returned to work as a nursing mom:  The areas of growth Noyes noted in the 2017 summative, completed before Plaintiff's lactation breaks sparked inter-staff conflict, were consistent with the performance concerns identified in Plaintiff's third year.

The comparator evidence Plaintiff presents in an effort to show Defendant's decision was "obviously" or "manifestly" unsupported is also unpersuasive.  "[E]xamples of disparate treatment 'need not be perfect replicas, [but] they must closely resemble one another in respect to relevant facts and circumstances.'"  Kosereis v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003) (second alteration in original) (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)).  But Plaintiff's comparator evidence does not involve individuals similarly situated to

Plaintiff with respect to the relevant facts and circumstances of her contract non-renewal.  The examples she gives of employees at FES who were also identified as having performance issues but were not consequently terminated committed misconduct for which they were subjected to discipline, and they were not probationary.  (See ECF No. 35, PageID #s 749-51)  By contrast, Plaintiff was perceived as underperforming during her probationary period, which caused administration to respond with an informal Growth Plan, special coaching, and increased supervision.  She was not being disciplined, but rather groomed in hopes that she would improve. Plaintiff also points to two probationary employees who did not take maternity leave or lactate at work and whose contracts were renewed after the third year despite having performance concerns identified by Noyes.  (Id. at PageID # 751.)  However, Plaintiff does not establish that these employees' performance concerns resembled Plaintiff's such that they serve as helpful comparators.  Further, these two examples are outweighed by Defendant's evidence that Plaintiff was the only probationary employee of the seven who took maternity leave and lactated at work during Noyes's tenure who was not promoted to continuing contract status.

In short, Plaintiff cannot establish a pregnancy discrimination claim based on disparate treatment.

### 2.  Retaliation

Title VII and the MHRA make it unlawful for employers to discriminate against an employee because she has opposed an unlawful discriminatory act or practice or has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" either antidiscrimination statute.  42 U.S.C. § 2000e-3(a); 5 M.R.S.A. § 4633.1.  A plaintiff proves discriminatory retaliation under these provisions by showing:  (1) she undertook protected conduct; (2) she suffered an adverse employment action; and (3) the protected activity was a but-

for cause of the employer's alleged adverse action. Ramsdell v. Huhtamaki, Inc., 992 F. Supp. 2d 1, 15 (D. Me. 2014). Defendant urges that Plaintiff cannot show her contract non-renewal was caused by retaliatory animus stemming from her protected activity. Here, as well, the Court agrees. Plaintiff's argument for a causal link between her protected activity and termination is largely indistinguishable from her argument for pretext in the disparate treatment context. (See ECF No. 34, PageID #s 699-70.) As the argument is unprevailing there, it is clearly insufficient in the retaliation context. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 348-60 (2013) (explaining that Title VII retaliation claims must be proved "according to traditional principles of but-for causation, not the lessened causation test" applicable in disparate treatment claims).

Therefore, Plaintiff has not established any trialworthy discrimination claims.

### B. FMLA Violations (Count 3)

Under the FMLA, an employee may take up to twelve weeks of protected leave in a twelve-month period because of the birth of a child and in order to care for that child. 29 U.S.C. § 2612(a)(1)(A). An employee establishes a prima facie case of FMLA retaliation by showing "(1) she availed herself of a protected FMLA right; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between [her] protected conduct and the adverse employment action." Germanowski v. Harris, 854 F.3d 68, 73 (1st Cir. 2017) (alteration in original) (internal quotations omitted) (quoting Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 719 (1st Cir. 2014)). Employees may also bring claims that an employer unlawfully interfered with their exercise of FMLA leave. See 29 U.S.C. § 2615(a)(1); Carrero-Ojeda, 755 F.3d at 722. A plaintiff bringing an FMLA cause of action under either theory has "the burden of proving a[] real impairment of [her] rights and resulting prejudice." Ragsdale v. Wolverine World

22

Wide, Inc., 535 U.S. 81, 90 (2002).  Plaintiff alleges that Defendant is liable for violation of the FMLA under both theories.

With respect to retaliation, the record clearly establishes the first and second elements of the claim, but Defendant urges that it does not support the third, causation.  Specifically, Defendant argues that a stringent "but-for" causation standard applies in FMLA retaliation claims and Plaintiff cannot meet this burden.  (See ECF No. 32, PageID #s 604-05.)  As the Court previously noted, it is an "open question" whether a "but-for" or "negative or motivating factor" causation standard applies in this context.  (Order on Mot. Dismiss (ECF No. 11), PageID # 96 n.6 (citing Chase v. U.S. Postal Serv., 843 F.3d 553, 559 n.2 (1st Cir. 2016)).)  Because the Court concludes that Plaintiff cannot establish a causal connection even under the lower "negative factor" standard, it need not resolve this issue.

The strongest piece of evidence that the relevant decisionmaker, Noyes, harbored retaliatory animus due to Plaintiff's FMLA leave is her comment in Plaintiff's 2017 summative evaluation that, due to her time off in her second probationary year, it would have been advisable to keep her on the second year of probation, rather than advance her to the third.  Considered, however, "not in splendid isolation, but as part of an aggregate package of proof," Noyes's comment cannot be understood as flowing from such animus.  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991).  The record demonstrates Noyes's support of Plaintiff's decision to take off more than her twelve weeks of FMLA leave as well as her efforts to ease Plaintiff's return to work afterward.  This is consistent with aggregate data showing that, during Noyes's tenure, (1) no employee who took FMLA leave except Plaintiff was terminated in the years after taking leave and (2) the six probationary employees who took FMLA maternity leave besides Plaintiff had their contracts renewed after taking leave.  Between Plaintiff's FMLA leave and her termination, Noyes

became aware of and sought to address performance issues that ultimately caused her not to renew Plaintiff's contract.  While Plaintiff's leave may have limited Noyes's opportunity to discern these performance concerns and intervene earlier, this record, viewed in the light most favorable to Plaintiff, does not support a conclusion that Plaintiff's use of FMLA leave was a negative factor in Noyes's employment decision.

This leaves Plaintiff's FMLA interference theory.  To prevail on such a theory, an employee must "establish that the employer denied her benefits to which the FMLA entitled her." Wheeler v. Pioneer Developmental Servs., Inc., 349 F. Supp. 2d 158, 164 (D. Mass. 2004).  Denial of such benefits includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).  See, e.g., McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 7 (D.C. Cir. 2010) ("McFadden can succeed on her claim under the FMLA without showing Ballard Spahr denied her any leave she requested; she need only show the employer interfered with the exercise of her FMLA rights." (internal citation omitted)); Kimes v. Univ. of Scranton, 126 F. Supp. 3d 477, 501-02 (M.D. Pa. 2015) (plaintiff who had never been denied FMLA leave basing an FMLA interference claim on theory that defendant's conduct "chilled her desire . . . and made her afraid to use her FMLA leave in the future").  Plaintiff argues that although she took all the FMLA leave to which she was entitled, she nevertheless suffered FMLA interference because Defendant's conduct following her leave discouraged her from exercising her FMLA rights in future.  However, Plaintiff cannot make out a claim under this theory because she has not offered evidence that she suffered an impairment of rights and resulting prejudice from any such interference.[14]  See Ragsdale, 535 U.S. at 90.  Plaintiff's FMLA claim is thus also not trialworthy.

---

[14] As Defendant notes, to the extent Plaintiff claims FMLA interference via Defendant's decision not to renew her contract, it is redundant of her retaliation claim.  (See ECF No. 32, PageID #607 n.13.)

## IV.     CONCLUSION

Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment (ECF No. 32).

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 29th day of July, 2020.